**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANGELO DAHLIA,
          *Plaintiff-Appellant*,

      v.

OMAR RODRIGUEZ, individually and
as a Lieutenant of the Burbank
Police Department; EDGAR
PENARANDA, individually and as a
Sergeant of the Burbank Police
Department; CITY OF BURBANK, a
municipal corporation; JOHN
MURPHY, individually and as a
Lieutenant of the Burbank Police
Department,
          *Defendants-Appellees*,

      and

TIM STEHR, individually,
          *Defendant*.

No. 10-55978

D.C. No.
2:09-cv-08453-
MMM-JEM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted En Banc
March 20, 2013—San Francisco, California

Filed August 21, 2013

Before: Alex Kozinski, Chief Judge, and Harry Pregerson, Stephen Reinhardt, Diarmuid F. O'Scannlain, Susan P. Graber, Richard A. Paez, Marsha S. Berzon, Johnnie B. Rawlinson, Consuelo M. Callahan, Carlos T. Bea, and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Pregerson;
Concurrence by Judge O'Scannlain

## SUMMARY[*]

### Civil Rights

The en banc court reversed the district court's Fed. R. Civ. P. 12(b)(6) dismissal and remanded in an action brought by a City of Burbank police officer under 42 U.S.C. § 1983, who alleged that he was placed on administrative leave in retaliation for disclosing his fellow officers' misconduct.

The court overruled *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009). The court held that (1) after *Garcetti v. Ceballos*, 547 U.S. 410 (2006), courts must make a "practical" inquiry when determining the scope of a government employee's professional duties and that *Huppert* erred in concluding that California broadly defines police officers' duties as a matter of law for the purpose of First

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Amendment retaliation analysis; and (2) placement on administrative leave can constitute an adverse employment action. The court further held that, on remand, plaintiff could renew his request for leave to amend his complaint to allege more explicitly which acts were protected by the First Amendment and which acts constituted adverse employment actions.

Specially concurring, Judge Pregerson stated that plaintiff's speech that reported unlawful acts by his fellow officers was protected under the First Amendment from retaliation by his superior officers at the Burbank Police Department regardless of whether he reported the police abuse up the chain of command or outside the chain of command.

Concurring only in the judgment, Judge O'Scannlain, joined by Chief Judge Kozinski, stated that he agreed that plaintiff was entitled to be granted leave to amend his complaint and it was on that narrow basis that he would reverse the district court's judgment. Judge O'Scannlain dissented from the majority's analysis, stating that with its decision to discard *Huppert*, and with its newly-minted "guiding principles" for identifying protected speech, the majority opinion reopened doors that the Supreme Court slammed shut in *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

**COUNSEL**

Michael A. Morguess (argued), Michael A. McGill, and Russell M. Perry of Lackie, Dammeier & McGill, Upland, California; Scott Michelman and Scott L. Nelson, Public Citizen Litigation Group, Washington, D.C., for Plaintiff-Appellant Angelo Dahlia.

Steven J. Renick (argued) and Eugene P. Ramirez of Manning & Kass, Ellrod, Ramirez, Trester, LLP, Los Angeles, California, for Defendant-Appellee Jon Murphy.

Ken Yuwiler and Michael Simidjian of Silver, Hadden, Silver, Wexler & Levine, Santa Monica, California, for Defendant-Appellee Omar Rodriguez.

Michael Logan Rains, Harry S. Stern, and Lara Cullinane-Smith of Rains, Lucia, Stern, PC, Pleasant Hill, California, for Defendant-Appellee Edgar Penaranda.

Richard R. Terzian of Burke, Williams & Sorensen, LLP, Los Angeles, California, for Defendant-Appellee City of Burbank.

Michael P. Stone and Muna Busailah of Riverside Sheriffs' Association Legal Defense Trust, Pasadena, California, for Amicus Curiae Riverside Sheriffs' Association and Riverside Sheriffs' Association Legal Defense Trust.

**OPINION**

PAEZ, Circuit Judge:

In this case we address the extent to which a police officer retains First Amendment protection when he discloses his fellow officers' misconduct. Angelo Dahlia, a detective in the Burbank Police Department ("BPD"), brought this 42 U.S.C. § 1983 First Amendment retaliation suit against the City of Burbank, the Chief of Police and several other police officers. The district court granted the defendants' motions to dismiss the § 1983 cause of action for failure to state a claim. Fed. R. Civ. P. 12(b)(6). The court reasoned that, under *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009), Dahlia's disclosure to the Los Angeles Sheriff's Department ("LASD") of his fellow officers' misconduct was not subject to First Amendment protection because he had a professional duty, as a matter of California case law, to report misconduct. The district court also held that Dahlia's placement on administrative leave did not constitute an "adverse employment action."

We reverse the district court on both grounds and overrule *Huppert*. We hold that (1) after *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006), courts must make a "practical" inquiry when determining the scope of a government employee's professional duties and that *Huppert* erred in concluding that California broadly defines police officers' duties as a matter of law for the purpose of First Amendment retaliation analysis; and (2) placement on administrative leave can constitute an adverse employment action. We further hold that, on remand, Dahlia may renew his request for leave to amend his complaint to allege more explicitly which acts

are protected by the First Amendment and which acts constitute adverse employment actions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.[1]

Following an armed robbery on December 28, 2007, at Porto's Bakery & Café in Burbank, California, Dahlia was assigned to assist in the robbery investigation, which was supervised by defendant Lieutenant Jon Murphy. The day after the robbery, Dahlia observed defendant Lieutenant Omar Rodriguez grab a suspect by the throat with his left hand, retrieve his handgun from its holster with his right hand, and place the barrel of the gun under the suspect's eye, saying, "How does it feel to have a gun in your face motherfucker." Rodriguez noticed Dahlia looking on in disbelief. Later that same evening, Dahlia heard yelling and the sound of someone being hit and slapped from inside a room where defendant Sergeant Edgar Penaranda was interviewing another suspect.[2]

Dahlia was subsequently excluded from participating in suspect interviews, and high-ranking officers within BPD essentially took control of the investigation. Witnesses and suspects continued to be physically assaulted and beaten in

---

[1] The following factual background is drawn from the allegations of Dahlia's complaint. Because Dahlia's complaint was dismissed under Federal Rule of Civil Procedure 12(b)(6), we take his factual allegations as true for the purposes of our review. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

[2] Murphy, Rodriguez and Penaranda were all high-ranking supervisors who outranked Dahlia.

BPD's interview rooms, while officers prevented anyone from walking past the rooms or into the audio room. Dahlia met with Murphy to disclose the abuse that he had witnessed. Dahlia told Murphy that the interviews were getting too physical and that Dahlia was having difficulty maintaining order in the investigation. Murphy responded by telling Dahlia to "stop his sniveling."

The physical beatings continued in BPD interview rooms and in the field, evidenced by the booking photos of various suspects. At one point, Chief of Police Stehr appeared at a briefing and, upon learning that not all of the robbery suspects were in custody, said, "Well then beat another one until they are all in custody."

After witnessing the misconduct and abuse, Dahlia approached Murphy a second time and pleaded that he did not have control over the case. Murphy became upset and told Dahlia that he "didn't want to hear this shit again" and that he was "tired of all the B.S." In January 2008, Dahlia and another detective met with Murphy a third time, telling him that "the beatings have to stop" and "the madness ha[s] to stop." Murphy did nothing to respond to these complaints and the abusive tactics continued.

In April 2008 officers learned that BPD's Internal Affairs ("IA") unit was planning to investigate the unlawful physical abuse and the other illegal procedures relating to the Porto's robbery investigation. Around the same time, Rodriguez began going out of his way to monitor Dahlia and ultimately threatened him not to say anything to IA. As the IA investigation grew nearer, Rodriguez and Penaranda contacted Dahlia on a daily basis, threatening him to keep quiet. Before the IA investigation commenced, Chief Stehr

told an IA lieutenant, "I put you in this position to make it go away."

On April 29, 2008, Dahlia was interviewed for the first time by IA. Immediately after the interview, Rodriguez confronted Dahlia and demanded to know what Dahlia had said during the interview. Dahlia's complaint is silent regarding what he actually said during the IA interview, though he told Rodriguez, out of fear, that he did not say anything to IA. When asked by Penaranda if he had disclosed anything to IA, Dahlia, out of fear for his safety, also told Penaranda that he had not.

On May 8, 2008, IA interviewed Dahlia a second time. After the interview, Dahlia received a call from Rodriguez directing him to report to a park. Dahlia went to the park, believing that there was an incident occurring, but encountered only Rodriguez and another officer there. Rodriguez approached him aggressively and asked, "What the fuck did you tell them?" Rodriguez then asked, almost verbatim, the questions posed by IA and attempted to intimidate Dahlia into revealing his answers. Rodriguez, Penaranda and another officer incessantly harassed, intimidated and threatened Dahlia over the following weeks, to the point where his working conditions were "fully consumed" by the intimidation.

On May 21, 2008, IA interviewed Dahlia a third time. Immediately after the interview, Rodriguez appeared and aggressively stared directly at Dahlia. The threats and intimidation continued during the subsequent months.

Toward the end of 2008, Penaranda and Murphy told Dahlia that a federal investigation into the Porto's robbery might be forthcoming and warned Dahlia not to disclose anything to federal investigators. In January 2009, rumors circulated more widely that the FBI had been contacted about commencing an investigation. At some point, Murphy told Dahlia, "It's on. The Feds are doing an investigation and heads are going to roll. Don't say anything." Penaranda told Dahlia, "It's gonna be bad. You can't say anything." Rodriguez also approached Dahlia and told him "not to talk to the feds." The complaint alleges neither that the FBI actually commenced an investigation nor that Dahlia ever spoke to the FBI.

On April 2, 2009, Rodriguez called Dahlia into his office, told Dahlia to sit down, and closed the door and the blinds. Rodriguez then retrieved his gun from its holster, looked at Dahlia, and placed the gun in a drawer. At one point during the meeting, Rodriguez placed his hands on the desk and told Dahlia, "I'm not a fucking cheese eating rat" and then commented that he was not afraid of being suspended or fired. Rodriguez also leaned forward and said, "Fuck with me and I will put a case on you, and put you in jail. I put all kinds of people in jail, especially anyone who fucks with me!" Dahlia reported this incident to the Burbank Police Officers' Association president, who reported it to the Burbank City Manager.

On May 11, 2009, LASD interviewed Dahlia about the Porto's robbery investigation. During the interview, Dahlia disclosed the defendants' misconduct, threats, intimidation and harassment. Four days later, Dahlia was placed on administrative leave pending discipline.

Dahlia alleges that he was subjected to adverse employment actions as a result of his protected speech activities and that there was no legitimate justification for the adverse actions. In alleging a § 1983 violation, Dahlia claims that defendants' retaliatory acts included, *inter alia*, threats, ostracism, denial of employment opportunities, undue scrutiny of work performance, denial of continued employment, and malicious statements calculated to destroy his reputation.

## B.

Dahlia filed his § 1983 complaint in November 2009, alleging seven claims: (1) retaliation against a public employee for speech disclosing police misconduct, in violation of the First Amendment; (2) retaliation against a public employee for disclosing information to a government or law enforcement agency, in violation of California Labor Code section 1102.5; (3) retaliation against a public employee for making an oral or written complaint to a governmental agency, in violation of California Labor Code section 6310; (4) retaliation against a public employee for disclosing an abuse of authority or a substantial and specific danger to public health or safety, in violation of California Government Code section 53298; (5) a violation of the Bane Act, California Civil Code section 52.1(b), which prohibits interference with the exercise of constitutional rights; (6) intentional infliction of emotional distress; and (7) negligent infliction of emotional distress. Dahlia sued the City of Burbank, Police Chief Stehr, Lieutenants Murphy and Rodriguez, Sergeants Penaranda and Jose Duran, and Detective Chris Canales.

Police Chief Stehr moved for summary judgment on several grounds, including qualified immunity. The district court denied without prejudice, as premature, Stehr's summary judgment motion because Dahlia had not yet had an adequate opportunity to conduct discovery. Stehr pursued an interlocutory appeal of the district court's denial of his motion for summary judgment. The original three-judge panel in this case reversed the denial of qualified immunity for Stehr in an unpublished memorandum disposition. *Dahlia v. Stehr*, 491 F. App'x 799 (9th Cir. 2012).

The remaining individual defendants moved, primarily relying on *Huppert*, to dismiss the case for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Granting these motions, the district court determined that Dahlia's § 1983 claim was barred because (1) he spoke pursuant to his official duties and thus was not constitutionally protected, and (2) placement on paid administrative leave is not an adverse employment action. The district court accordingly dismissed Dahlia's § 1983 claim with prejudice, and declined to exercise supplemental jurisdiction over Dahlia's state law claims.

A panel of this court reluctantly affirmed on the ground that it was bound by *Huppert v. City of Pittsburg* to conclude that Dahlia spoke pursuant to his official duties. *Dahlia v. Rodriguez*, 689 F.3d 1094 (9th Cir. 2012). In no uncertain terms, the panel stated that "[t]he reasoning in *Huppert* that professional duties can be determined as a matter of law is wrong, and the result that reports of police misconduct are not protected by the First Amendment is dangerous." *Id*. at 1106–07. Contrary to the district court, the panel found that placement on administrative leave and the resulting consequences, "if proven, . . . may very well constitute an

adverse employment action." *Id*. at 1107. Upon a majority vote of eligible judges, we granted rehearing en banc.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 to review the district court's final judgment dismissing with prejudice Dahlia's claims against Murphy, Penaranda, Rodriguez and the City of Burbank.[3] We review *de novo* the district court's dismissal of Dahlia's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In undertaking this review, "we must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *TwoRivers*, 174 F.3d at 991. Dismissal under Rule 12(b)(6) is inappropriate unless Dahlia's complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III. ANALYSIS

"It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Moreover, the public has a strong interest in hearing from public employees, especially because "[g]overnment employees are often in the best position to know what ails the

---

[3] Prior to en banc oral argument, Dahlia dismissed his appeal against the other named defendants, Canales and Duran.

agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674 (1994). It may often be the case that, unless public employees are willing to blow the whistle, government corruption and abuse would persist undetected and undeterred.

In *Pickering*, the Supreme Court defined a balancing test for First Amendment retaliation cases involving public employees. The task for us is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *see also Connick v. Myers*, 461 U.S. 138, 142 (1983). The Court has recognized that "the First Amendment interests at stake extend beyond the individual speaker . . . [because of] the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. In the classic whistleblower case the state has no legitimate interest in covering up corruption and physical abuse. As an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation.

But our inquiry does not end there. In unraveling the case law since *Pickering*, we have further refined the Court's balancing test into a five-step inquiry. We ask:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse

> employment action; (4) whether the state had
> an adequate justification for treating the
> employee differently from other members of
> the general public; and (5) whether the state
> would have taken the adverse employment
> action even absent the protected speech.

*Eng*, 552 F.3d at 1070.**[4]**

   In this case, we can easily answer the first question.
Dahlia's speech—reporting police abuse and the attempts to
suppress its disclosure—is quintessentially a matter of public
concern. *See Connick*, 461 U.S. at 148 (noting that speech
warrants protection when it "seek[s] to bring to light actual or
potential wrongdoing or breach of public trust"); *Thomas v.
City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004) (finding
that "[u]nlawful conduct by a government employee or illegal
activity within a government agency is a matter of public
concern"); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d
Cir. 2011) (noting that "'[e]xposure of official misconduct,
especially within the police department, is generally of great

---

   **[4]** We have sometimes described the *Eng* steps as "sequential." *See, e.g.*,
*Johnson*, 658 F.3d at 961; *Robinson*, 566 F.3d at 822; *Eng*, 552 F.3d at
1070. We now clarify that, by "sequential," we mean only that all the
factors are necessary, in the sense that failure to meet any one of them is
fatal to the plaintiff's case. *See, e.g.*, *Desrochers v. City of San
Bernadino*, 572 F.3d 703, 709–19 (9th Cir. 2009) (holding that plaintiffs
could not show their speech covered a matter of public concern, and
therefore could not state a First Amendment retaliation claim, without
addressing the other *Eng* steps). That all five factors are necessary does
not mean that courts must always go through the steps in the same order
that they are listed in *Eng*. To the contrary, precisely because all five
factors are independently necessary, it may be more efficient in some
instances to answer a potentially dispositive question further down the *Eng*
list first.

consequence to the public'" (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001))), *cert. denied*, 132 S. Ct. 1634 (2012); *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) (finding it "worth noting that an employee's charge of high level corruption in a government agency has all of the hallmarks that we normally associate with constitutionally protected speech . . . and criticisms of the government lie at or near the core of what the First Amendment aims to protect").[5]

The district court, however, ruled that Dahlia's § 1983 First Amendment claim was barred because it found that (1) as a matter of law, Dahlia could not establish that he spoke "in the capacity of a private citizen and not a public employee," *Eng*, 552 F.3d at 1071; and (2) being placed on administrative leave does not constitute an adverse employment action for the purposes of the First Amendment. We disagree with both conclusions and analyze them in turn.

## A. Speech as a Private Citizen

### 1.

In *Garcetti*, the Supreme Court narrowed the First Amendment protections for public employees. 547 U.S. 410. The Court added an additional requirement to the *Pickering*

---

[5] In addressing the "public concern" prong of *Eng*, we clarified that "[i]t is not determinative that [a plaintiff] did not air his concerns publicly." *Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 749 (9th Cir. 2010); *see also Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979) (noting that "[n]either the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public").

balancing test, holding that the First Amendment does not protect employee speech when that speech is "pursuant to . . . official duties." *Id*. at 421. This requirement is captured by the second prong of our test set forth in *Eng*, 552 F.3d at 1070. Whether Dahlia's speech is protected by the First Amendment is rooted in the Court's analysis in *Garcetti*.

In *Garcetti*, plaintiff Ceballos was a deputy district attorney for Los Angeles County assigned as a calendar deputy during the relevant period. 547 U.S. at 413. A defense attorney contacted Ceballos and asked him to investigate inaccuracies in a critical police affidavit. *Id*. "According to Ceballos, it was not unusual for defense attorneys to ask calendar deputies to investigate aspects of pending cases." *Id*. at 414. After investigating the alleged inaccuracies, "Ceballos determined the affidavit contained serious misrepresentations," which he reported to his supervisor. *Id*. He "followed up by preparing a disposition memorandum" and an additional memo to his supervisor. *Id*. After a heated meeting attended by Ceballos, his supervisor and the affiant, the supervisor decided to proceed with the prosecution. *Id*. Ceballos brought a § 1983 First Amendment retaliation claim challenging the imposition of adverse employment actions in the aftermath of these events. *Id*. at 415.

In rejecting Ceballos' claim, the Court held that, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. The Court said that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id*. Importantly, the Court noted that "the

parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id*. at 424.[6]

The Court further explained that various easy heuristics are insufficient for determining whether an employee spoke pursuant to his professional duties. The Court said that it was "not dispositive" that "Ceballos expressed his views inside his office, rather than publicly. . . . Employees in some cases may receive First Amendment protection for expressions

---

[6] Although it was not essential to finding that Ceballos acted pursuant to his professional duties in preparing the memorandum to his supervisor, the Court offered further explanation:

> [T]he fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case [] distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline. . . . Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. . . . Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance.

*Garcetti*, 547 U.S. at 421–22 (paragraph breaks omitted).

made at work." *Id*. at 420.  It was also "nondispositive" that "[t]he memo concerned the subject matter of Ceballos' employment. . . .   The First Amendment protects some expressions related to the speaker's job."  *Id*. at 421. Additionally, the Court rejected "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.  *Id*. at 424.  The Court concluded:

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id*. at 424–25 (citation omitted).[7]

---

[7] Judge O'Scannlain's concurrence suggests that there should be a "bright line" between citizen-speech and employee-speech.  O'Scannlain Concurrence at 49–50, *id*. at 49 n.2 (noting that "[t]he dissenters in *Garcetti*, as well as the academic literature since, recognize the bright-line nature of the inquiry").  We do not take issue with the straight-forward proposition that *Garcetti* altered the *Pickering* balancing approach by recognizing that once a plaintiff's speech is classified as having been made pursuant to an employee's official duties, then such speech is categorically denied First Amendment protection.  *See* O'Scannlain Concurrence at 49 n.2 and citations therein.  However, this bright-line rule only begs the question of whether a plaintiff actually spoke pursuant to his official duties.  It is that inquiry that is before us here, and *Garcetti* explicitly said that there is no bright line rule for making that determination.  As Judge O'Scannlain quotes: "'Employees *in some cases* may receive First Amendment protection for expressions made at work.'"

Three years after *Garcetti*, a panel of this court decided *Huppert v. City of Pittsburg*, another § 1983 First Amendment retaliation case. The *Huppert* majority affirmed the grant of summary judgment to the defendant, holding that California police officers acted pursuant to their official duties when they investigated and reported on corruption within the police department by (1) assisting the District Attorney as ordered, (2) defying the police chief's orders and continuing an investigation at the behest of an immediate supervisor, (3) cooperating with the FBI, and (4) testifying before a grand jury. 574 F.3d at 698–700, 703, 706–08.

Although the *Huppert* majority engaged in the requisite "practical" inquiry in determining that the officers acted pursuant to their official duties as to the first two speech acts, *id*. at 703–06,[8] it relied on a 1939 California court of appeal

---

O'Scannlain Concurrence at 50 (quoting *Garcetti*, 547 U.S. at 420 (emphasis in O'Scannlain Concurrence)). Indeed, in the only portion of the opinion dealing with how to define the scope of an employee's job duties, the *Garcetti* Court exclusively pointed to non-dispositive factors. 547 U.S. at 424–25.

[8] As to the first issue in *Huppert*, the majority considered the factual record and determined that the undisputed facts (including an admission by the plaintiff, Huppert) enabled it to conclude as a matter of law that Huppert assisted the District Attorney pursuant to his professional duties. 574 F.3d at 703–06.

As to the second issue, although the dissent disagreed, the majority similarly concluded that, based on the undisputed facts, the plaintiff officers investigated corruption and prepared a report for the police chief and the city manager pursuant to their professional duties. *Id*. at 706; *id*. at 720 (W. Fletcher, J., dissenting). In concluding that there *was* a disputed question of fact as to the scope of the plaintiffs' duties, the dissent pointed out that the police chief had instructed the plaintiffs to cease their investigation whereas the plaintiffs' direct supervisor had

decision to conclude, as a matter of law, that an officer acted pursuant to his official duties in cooperating with the FBI and testifying before a grand jury, *id*. at 706–10 (relying on *Christal v. Police Comm'n of City of San Francisco*, 92 P.2d 416 (Cal. Dist. Ct. App. 1939)).[9]

---

instructed the opposite. *Id*. at 720 (W. Fletcher, J., dissenting). We hold, *infra*, that in determining the scope of a plaintiff's job duties, a fact-finder should consider the instructions given to a plaintiff by his superiors. To the extent that *Huppert* can be read to preclude this consideration, we overrule it.

[9] The full passage from *Christal* relied upon by the *Huppert* majority reads like a civics textbook:

> "The duties of police officers are many and varied. Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. Among the duties of police officers are those of preventing the commission of crime, of assisting in its detection, and of disclosing all information known to them which may lead to the apprehension and punishment of those who have transgressed our laws. When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury. It is for the performance of these duties that police officers are commissioned and paid by the community."

*Huppert*, 574 F.3d at 707 (quoting *Christal*, 92 P.2d at 419).

In relying on *Christal*'s sweeping description of a California police officer's professional duties, the *Huppert* majority failed to heed *Garcetti*'s mandate that "the proper inquiry [to determine the scope of an employee's professional duties] is a practical one." *Garcetti*, 547 U.S. at 424. The Court's stated reason for requiring such an inquiry is precisely because "employers [cannot] restrict employees' rights by creating excessively broad job descriptions." *Id*. Relying on a broad court-created job description applicable to every member of a profession operates to do just that. Moreover, even if *Christal*'s formulation of California police officers' duties remains generally accurate, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 425.

Given the factual similarities here, the three-judge panel in this case, although expressing disagreement with *Huppert*, concluded that it was bound by it. We overrule *Huppert* to the extent that it improperly relied on a generic job description and failed to conduct the "practical," fact-specific inquiry required by *Garcetti*. In so holding, we reject the defendants' argument that California police officers are unique for the purposes of First Amendment retaliation claims. *See Kannisto v. City of San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976) (noting in a § 1983 First Amendment retaliation case that "[t]he Supreme Court has made it clear that 'policemen, like teachers and lawyers . . . are not relegated to a watered-down version of constitutional rights.' *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967)").

**2.**

We also reject Judge O'Scannlain's—and the defendants'—argument that *Christal* and its progeny are controlling here for the additional reason that the authority he cites is inapposite. Although Judge O'Scannlain's concurrence does not mention it, O'Scannlain Concurrence at 53–56, *Christal* explicitly limited its holding to whether police officers who were being investigated for criminal activities could assert their Fifth Amendment right against self-incrimination and still remain police officers. 92 P.2d at 418–19 ("We are concerned here only with the result of the exercise of [the Fifth Amendment] privilege, by those holding the positions of police officers, in an investigation by which it was sought to determine whether such officers had been guilty of criminal activities in connection with their duties as police officers."). Even were we to ignore its limited holding, *Christal* explicitly stated that officers have a "duty to disclose such facts *to their superiors*." *Id*. at 419 (emphasis added). Therefore, even over-reading *Christal*'s dicta, and then applying it in clear violation of *Garcetti*, would not resolve this case.

The thrust of Judge O'Scannlain's argument—like that of the defendants—is that police officers are unique under California law for the purpose of First Amendment retaliation claims. This is true, he argues, because California police officers have a freestanding professional duty to disclose the unlawful conduct of others to their superiors as well as to outside law enforcement agencies. O'Scannlain Concurrence at 53–56. Yet neither the case law nor the statute on which he relies supports this proposition.

Rather, the California cases cited by defendants—a subset of which Judge O'Scannlain relies on—stand for the unsurprising proposition that a public employee cannot, when ordered, *refuse to comply* with a lawful investigation and escape discipline for so doing.  As the California courts have reiterated even outside the policing context, "'[a] public employee, of course, cannot be forced to give an answer which may tend to incriminate him, but he may be required to choose between disclosing information and losing his employment.'" *Hingsbergen v. State Pers. Bd.*, 50 Cal. Rptr. 59, 64 (Cal. Dist. Ct. App. 1966) (quoting *Steinmetz v. Cal. State Bd. of Educ.*, 285 P.2d 617, 621–22 (Cal. 1955) (en banc)).  Hingsbergen, for example, was not a police officer, but an employee of the California Department of Motor Vehicles ("DMV").  *Id*. at 60.  He was dismissed for "willful disobedience" because he refused to answer questions when he was ordered to cooperate in an investigation by the state attorney general's office and the local district attorney into malfeasance within the DMV.  *Id.* at 61.  Indeed, as *Hingsbergen* indicates, any public employee may face discipline for stonewalling, against orders to comply, a properly conducted investigation into misconduct within his department.  The California cases and statute cited by Judge

O'Scannlain stand for nothing further.**[10]**  *See* O'Scannlain Concurrence at 53–53, 65.

That an officer could be disciplined for failing to *comply with an order* only begs the question in Dahlia's case.  Here, the only allegations in the record are that Dahlia was ordered *not to comply* with an investigation.**[11]**

---

**[10]** California Government Code section 3304(a) provides in part:

> Nothing in this section shall preclude a head of an agency from ordering a public safety officer to cooperate with other agencies involved in criminal investigations.  If an officer fails to comply with such an order, the agency may officially charge him or her with insubordination.

Cal. Gov't Code § 3304.  *See Riverside Cnty. Sheriff's Dep't v. Zigman*, 87 Cal. Rptr. 3d 358 (Cal. Ct. App. 2008) (holding that a police officer could not invoke the marital privilege in an administrative investigation into her police officer husband's theft and use of methamphetamine and avoid discipline pursuant to departmental policy); *Alhambra Police Officers Ass'n v. City of Alhambra Police Dep't*, 7 Cal. Rptr. 3d 432, 438 (Cal. Ct. App. 2003) (holding that California's Public Safety Officers Procedural Bill of Rights Act did not permit a police union representative to "locate and remove documentary evidence pertaining to the misconduct investigation of another officer and then to return the evidence to the officer accused of misconduct—in admitted contravention of department rules and procedures"); *Titus v. L.A. Cnty. Civil Serv. Comm'n.*, 181 Cal. Rptr. 699 (Cal. Ct. App. 1982) (holding that a police officer who also acted as an attorney could not invoke the attorney-client privilege and impede an investigation by his police department into his client's illegal activity and simultaneously avoid being sanctioned for doing so).

**[11]** The other California cases cited by Judge O'Scannlain and the defendants, as in *Christal*, invariably involve a police officer trying to avoid incriminating *himself*.  That a police officer cannot hide from the law and simultaneously keep his badge does not imply that an officer has a freestanding professional duty to report the unlawful activity *of others*.

**3.**

Our case law since *Garcetti* provides further guidance. In *Posey*, we analyzed a § 1983 First Amendment retaliation claim brought by a high school security guard against the school district that was dismissed on summary judgment. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1123 (9th Cir. 2008). Considering the divergent views of other circuits, we concluded that "after *Garcetti* the inquiry into the protected status of speech presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Id*. at 1130. Therefore we held that, "when there are genuine and material disputes as to the scope and content of the plaintiff's job responsibilities, the court must reserve judgment on [whether the plaintiff's speech was pursuant to his official duties] . . . until after the fact-finding process." *Id*. at 1131; *see also Robinson v. York*, 566 F.3d 817, 823–24 (9th Cir. 2009) (holding that the "scope of [the plaintiff's] job duties is a question of fact"); *Eng*, 552 F.3d at 1071 (noting that "the question of the scope and content of a plaintiff's job responsibilities is a question of fact" (internal quotation marks omitted)); *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir.

---

*See Szmaciarz v. Cal. State Pers. Bd.*, 145 Cal. Rptr. 396 (Cal. Dist. Ct. App. 1978) (holding that a correctional officer was properly disciplined when he refused to answer questions or submit to a polygraph during an investigation into his use and transport of marijuana into a prison); *Fichera v. Cal. State Pers. Bd.*, 32 Cal. Rptr. 159 (Cal. Dist. Ct. App. 1963) (holding that a state police officer was properly terminated for refusing to take a polygraph test in the investigation of an accusation against him); *Frazee v. Civil Serv. Bd. of City of Oakland*, 338 P.2d 943 (Cal. Dist. Ct. App. 1959) (same as to a local police officer).

2006) (holding that determining the scope of professional duties requires "factual determinations").**[12]**

In *Posey*, we then held that the district court erred in granting summary judgment to the school district. We reasoned that there was a genuine dispute as to whether Posey acted pursuant to his official duties when he expressed his concern about school security in a letter to district

---

[12] As we recognized in *Posey*, our view that "the scope and content of a plaintiff's job responsibilities is a question of fact" is consistent with holdings of the Third, Seventh, and Eighth Circuits, but not with that of the Fifth, Tenth, and D.C. Circuits. 546 F.3d at 1128–30. We continue to adhere to our view and note that when an inquiry "is a mixed question of law and fact, . . . it often will be inappropriate to take the question from the jury." *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554 (1997).

Moreover, even several of the circuits that classify the inquiry into the scope of professional duties as a "question of law" nevertheless undertake a tailored, fact-specific assessment of a plaintiff's professional circumstances. *See, e.g.*, *Charles v. Grief*, 522 F.3d 508, 512–14 (5th Cir. 2008) (analyzing plaintiff's particular professional role and duties, even though the ultimate question of whether speech is entitled to protection is considered a legal question); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204–05 (10th Cir. 2007) (analyzing the contents of teachers' contracts and parsing aspects of their speech to classify comments on, e.g., their school's "expectations regarding student behavior" as unprotected speech and comments on, e.g., "staffing levels" at the school as protected speech); *Wilburn v. Robinson*, 480 F.3d 1140, 1150–51 (D.C. Cir. 2007) (conducting factual inquiry into nature of plaintiff's particular professional responsibilities).

Since *Posey*, the Fourth Circuit reversed the dismissal under Rule 12(b)(6) of a police officer's § 1983 First Amendment retaliation claim because "the question whether the [plaintiff's internal memorandum that he released to the press] . . . was written as part of his official duties was a disputed issue of material fact." *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009).

administrators. *Posey*, 546 F.3d at 1124. The parties disputed whether Posey's duties included writing such internal communications about school security. *Id*. at 1124–25 (noting that the district argued that providing "reports and information about security matters at the high school" was "an inherent part of his duties," while Posey contended that "his role in student discipline did not extend beyond discrete tasks such as ensuring that the parking lot remained orderly at the end of the school day").

In *Freitag*, defendant prison officials appealed a jury verdict in favor of a correctional officer rendered before *Garcetti*. *Freitag*, 468 F.3d at 532, 536. Applying *Garcetti* to the § 1983 First Amendment retaliation claim, we held that Freitag acted pursuant to her professional duties when she made "internal reports of inmate sexual misconduct and documentation of the prison's failure to respond." *Id*. at 546. In contrast, we held that she "acted as a citizen" when she complained about the same circumstances in a letter to a state senator and to the state inspector general. *Id*. at 545. We found it "a closer question" worthy of remand to the district court familiar with the trial, whether Freitag acted pursuant to her official duties when she sent a letter to the director of the state prison system. *Id*. at 546. We were "unsure whether prison guards are expected to air complaints regarding the conditions in their prisons all the way up to" the director of the state system. *Id*.

In more than a half-dozen cases since *Freitag*, we have planted additional guideposts for determining the scope of a plaintiff's professional duties for the purposes of the First Amendment. *See, e.g.*, *Ellins v. City of Sierra Madre*, 710 F.3d 1049 (9th Cir. 2013); *Karl v. City of Mountlake Terrace*, 678 F.3d 1062 (9th Cir. 2012); *Clairmont v. Sound*

*Mental Health*, 632 F.3d 1091 (9th Cir. 2011); *Anthoine*, 605 F.3d 740; *Robinson*, 566 F.3d 817; *Alaska v. EEOC*, 564 F.3d 1062 (9th Cir. 2009) (en banc); *Eng*, 552 F.3d 1062; *Marable*, 511 F.3d 924.

## 4.

Precisely because of the fact-intensive nature of the inquiry, no single formulation of factors can encompass the full set of inquiries relevant to determining the scope of a plaintiff's job duties. However, we find that existing case law and common sense dictate a few guiding principles relevant to the case before us.[13]

First, particularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a

---

[13] Other circuits have set forth illustrative lists of factors to consider when determining whether a given instance of speech falls within the scope of a plaintiff's job duties. *See, e.g.*, *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540–41 (6th Cir. 2012) (identifying as factors: "the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter"; "whether the statements were made to individuals up the chain of command"; "whether the content of the speech is nothing more than the quintessential employee beef: management has acted incompetently"; "whether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment" (internal quotation marks omitted)); *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011) (listing as "instructive" but not dispositive factors: "whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance'); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech" (citations omitted)).

relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties. When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties. *See Freitag*, 468 F.3d at 545–46 (holding that the correctional officer's communications with a state senator and the inspector general were protected speech, but her internal reports were not); *see also Karl*, 678 F.3d at 1072; *Clairmont*, 632 F.3d at 1105–06; *Alaska*, 564 F.3d at 1070–71 (holding that the plaintiff's act of holding a press conference to protest sex discrimination in her office was protected speech because, *inter alia*, her "official duties didn't require her to . . . bring the alleged sexual harassment to the public's attention"). Thus, we agree with the Fifth Circuit that, generally, "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job," *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008), although "it is not dispositive that a public employee's statements are made internally," *id*. at 313 n.3. "If however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Id*. at 313 (citing *Freitag*, 468 F.3d 528).[14]

---

[14] In its amicus brief, the Riverside Sheriffs' Association and Riverside Sheriffs' Association Legal Defense Trust support this chain-of-command distinction. *See* Amicus Br. at 2 (arguing that "a police officer's speech on a matter of important public concern[] should only fall outside the scope of First Amendment protection if it is made pursuant to his or her routine or core duties, *within his or her chain of command*, and in pursuit of his or her duty to report misconduct *to a superior*" (emphases added)).

Second, the subject matter of the communication is also of course highly relevant to the ultimate determination whether the speech is protected by the First Amendment. *See Handy-Clay*, 695 F.3d at 540 (identifying as a relevant factor the speech's "general subject matter" (internal quotation marks omitted)). When an employee prepares a routine report, pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties. *See Garcetti*, 547 U.S. at 421 (holding that a deputy district attorney's preparation of a memorandum regarding the merits of a particular case was not First Amendment protected speech because preparation of such memoranda was a routine part of what he "was employed to do"); *Freitag*, 468 F.3d at 546 (holding that a correctional officer's "internal reports of inmate sexual misconduct" were not constitutionally protected speech). By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit.

Third, we conclude that when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties. Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a particular type of speech provides strong evidence that the act of speech was not, as a "practical" matter, within the employee's job duties notwithstanding any suggestions to the contrary in the employee's formal job description. *Garcetti*, 547 U.S. at

424–25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.").  We note that our sister circuits have disagreed with one another on this point.  *Compare Jackler*, 658 F.3d at 241–42 (holding that a police officer was entitled to First Amendment protection when he filed a truthful affidavit pursuant to his job duties and later refused the police chief's pressure to substitute a false affidavit, concluding that the First Amendment protected his refusal to comply with the illegal orders), *with Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir.) (concluding that *Jackler* was wrongly decided because, despite the police chief's illegal order, "the illegality of a government employer's order does not necessarily mean the employee has a cause of action *under the First Amendment* when he contravenes that order"), *denying reh'g to* 642 F.3d 1122 (D.C. Cir. 2011).  As in *Jackler*, we think that it is relevant to the resolution of Dahlia's case that Dahlia disclosed misconduct to LASD in contravention of the numerous threats and admonitions from his superiors not to reveal the misconduct to anyone.  Even assuming *arguendo* that Dahlia might normally be required to disclose misconduct pursuant to his job duties, here he defied, rather than followed, his supervisors' orders.  As part of a "practical" inquiry, a trier of fact must consider what Dahlia was actually told to do.  *See Garcetti*, 547 U.S. at 424–25; *see also Robinson*, 566 F.3d at 820–21, 823–24 (finding that we lacked jurisdiction where the district court found that there were genuine factual issues "regarding whether the scope of Robinson's duties included reporting police misconduct" when Robinson, a police officer, filed multiple misconduct

reports and testified to the same effect despite his superiors' suggestions that he not do so).[15]

These principles serve as a necessary guide to analyzing the fact-intensive inquiry mandated by *Garcetti*.

**5.**

We next apply these principles to Dahlia. Although the district court focused exclusively on Dahlia's disclosure to LASD, Dahlia alleged several independent acts that could potentially be subject to First Amendment protection. Because the district court granted a Rule 12(b)(6) motion to dismiss, our task is not to resolve any factual dispute, but merely to determine whether Dahlia's allegations support a reasonable inference that he acted outside of his professional duties in each instance.[16] At the motion to dismiss stage, we take Dahlia's well-pleaded factual allegations as true. On remand, the parties will have an opportunity to conduct discovery as to Dahlia's professional duties. Nonetheless, it is within our wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development. *Twombly*, 550 U.S. at 570.[17]

---

[15] We decline to adopt as binding law a passing reference made by some of the *Garcetti* dissenters. O'Scannlain Concurrence at 62 (quoting *Garcetti*, 547 U.S. at 433 (Souter, J., dissenting)).

[16] As discussed *supra*, we find it evident that Dahlia's speech addressed, in each instance, a matter of public concern.

[17] Were this case at the summary judgment stage and the undisputed facts enabled us to conclude whether Dahlia spoke pursuant to his job duties, then we could perform the "screening" role that Judge O'Scannlain

**a.**

Dahlia initially disclosed the misconduct that he had observed to defendant Lieutenant Murphy, the officer in charge of the Porto's robbery investigation, who told him to "stop his sniveling." Dahlia alleged that he met with Murphy two additional times regarding the misconduct, pleading that "the beatings have to stop." Even construing the facts and drawing all inferences in Dahlia's favor, the only reasonable conclusion is that Dahlia acted pursuant to his job duties when he—as a detective investigating the Porto's robbery and prior to receiving any threats or orders to the contrary—reported up the chain of command to the supervising lieutenant overseeing the investigation about abuse related to that same investigation.[18] That Murphy appears to have ignored Dahlia's initial report does not convert into protected speech Dahlia's later reports to the same supervisor. *See Freitag*, 468 F.3d at 545–46.[19]

---

exhorts us to play. O'Scannlain Concurrence at 59. At the pleading stage, our role is more limited.

[18] By reporting to Murphy, a lieutenant, and not the sergeant leading the investigation, Penaranda, Dahlia likely skipped one level in the chain of command. This ambiguity is not sufficient to cast doubt on our conclusion here, where Dahlia specifically alleged that Murphy "oversaw the entire Porto's robbery investigation," and Penaranda—Dahlia's direct supervisor—was the subject of Dahlia's report.

[19] Judge Pregerson argues lucidly why the First Amendment should protect a police whistleblower who defies his superiors' attempts to silence him. *See generally* Pregerson Concurrence. As we conclude, *supra* in III.A.4., when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties. Here, however, Dahlia reported the misconduct to Murphy prior to being subjected to his superiors' threats

**b.**

Dahlia subsequently met with BPD's Internal Affairs officers three times. He alleged that he was harassed and threatened not to report any misconduct in anticipation of and following each meeting. Conspicuously, Dahlia does not allege that he actually disclosed any misconduct during his interviews with IA.

In meeting with the IA officers, Dahlia does not allege that he acted in contravention of his supervisors' orders. Dahlia does not allege that anyone ever instructed him not to *meet* with IA, but only that supervisors threatened him not to *say* anything when interviewed. Because Dahlia appears to have done precisely what his superiors wanted him to do—that is, meet with IA but stay mum—we cannot say that Dahlia acted in contravention of their orders.

Nonetheless, Dahlia may very well have acted outside his chain of command when he met with IA. Although Dahlia did not explicitly allege that he acted outside his professional duties when he met with IA, this is not dispositive because we must draw all reasonable inferences in his favor. It is possible that Dahlia's professional duties required him to meet with IA at IA's insistence, but it is also plausible that Dahlia's act of meeting with IA was outside his job duties for the purpose of the First Amendment. At this stage of the proceedings, where, as here, there is no allegation regarding a BPD officer's duties with respect to meeting and cooperating with IA, we must resolve the ambiguity in Dahlia's favor. Drawing this inference in Dahlia's favor, we

and intimidation and therefore could not have been acting in contravention of them.

conclude that Dahlia has adequately alleged that his meetings with IA are protected by the First Amendment.

**c.**

After word had spread that the FBI might be investigating BPD, Rodriguez allegedly called Dahlia into his office and threatened to "put a case on" him and put him "in jail." Dahlia alleged that he reported this incident to the Burbank Police Officers' Association president, who in turn reported it to the city manager.[20]  As with his other acts, Dahlia does not specifically allege that he acted outside his job duties when he reported the incident, nor that the retaliation he faced was directly caused by this act of reporting.  Nonetheless, guided by the principles articulated above and drawing all reasonable inferences in Dahlia's favor, we conclude that Dahlia's report to his police union constituted protected speech.  At this stage in the proceedings, it is reasonable to infer that Dahlia did  not have a duty to report threats to his union, which constitutes a separate entity from BPD.

**d.**

Ultimately, Dahlia disclosed the defendants' misconduct, threats, and harassment to LASD when interviewed about the Porto's robbery investigation.[21]  In doing so, Dahlia clearly

---

[20] This is not merely an "employee beef: management has acted incompetently," *Handy-Clay*, 695 F.3d at 540; rather, the alleged threat and attempt to stifle an investigation into police misconduct is clearly a matter of great public concern, *see Thomas*, 379 F.3d at 809.

[21] In his briefs on appeal, Dahlia also referenced disclosing information to the FBI, but there are no allegations in the complaint that Dahlia ever spoke with, let alone disclosed anything to, federal agents.

spoke outside the chain of command and, indeed, to an outside agency altogether. Whether Dahlia ultimately acted pursuant to his job duties when he disclosed misconduct to LASD may well turn on whether discovery reveals that Dahlia's supervisors instructed him to meet with and disclose information to LASD or in fact Dahlia did so of his own volition. Construing the complaint in Dahlia's favor, his disclosure to LASD is protected by the First Amendment.

## B. Adverse Employment Action

The district court dismissed Dahlia's suit on the alternative ground that placement on administrative leave is not an adverse employment action. We disagree. We conclude that, under some circumstances, placement on administrative leave can constitute an adverse employment action.[22] Moreover, we conclude that Dahlia sufficiently

---

[22] The district court also found that Dahlia failed to allege that any of the individual defendants, other than Chief Stehr, caused him to be placed on administrative leave or to suffer any other adverse employment consequence. To the extent that the particular threats and harassment by Penaranda and Rodriguez can constitute adverse employment actions, we disagree. Dahlia has alleged as clearly as possible, pointing to specific instances, that both defendants threatened and harassed him in an attempt to silence him. With respect to Dahlia's placement on administrative leave, on remand Dahlia may seek leave to amend his complaint to clarify his allegations. We note that "'personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable.'" *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). The "'requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Johnson*, 588 F.2d at 743–44).

alleged additional acts that could also constitute adverse employment actions.[23]

"To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden." *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). In *Coszalter*, we said that, in First Amendment retaliation cases, "[t]he goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights." *Id.* at 974–75 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 73 (1990)). Therefore, we held that the proper inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity." *Id.* at 976 (internal quotation marks omitted); *see also id.* (holding that "if the plaintiffs in this case can establish that the actions taken by the defendants were 'reasonably likely to deter [them] from engaging in protected activity [under the First Amendment],' they will have established a valid claim under § 1983" (alterations in original)).

We have not previously decided whether placement on administrative leave constitutes an adverse employment action. *See Lakeside–Scott v. Multnomah County*, 556 F.3d 797, 803 n.7 (9th Cir. 2009) (noting that "being placed on

---

[23] In his opposition to defendants' motions to dismiss, Dahlia requested leave to amend his complaint. In light of its ruling that *Huppert* controlled, the district court never addressed Dahlia's requests for leave to amend, apparently because any amendment would have been futile. On remand, in the event that Dahlia renews his request to amend his complaint, the district court should grant him leave to clarify his allegations.

administrative leave might qualify as an adverse employment action" but declining to reach the issue because it had not been properly preserved for appeal). Dahlia's assertions—that administrative leave prevented him from taking the sergeant's exam, required him to forfeit on-call and holiday pay, and prevented him from furthering his investigative experience—if proved, would constitute an adverse employment action. The inability to take a promotional exam, loss of pay and opportunities for investigative experience, as well as the general stigma resulting from placement on administrative leave appear "reasonably likely to deter employees from engaging in protected activity." *Coszalter*, 320 F.3d at 976.

Dahlia made other allegations of conduct that may also constitute an adverse employment action. "Various kinds of employment actions may have an impermissible chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights." *Id.* at 975. Dahlia alleged that Rodriguez threatened to "put a case" on him and to put him "in jail." These threats, if true, were made with the specific purpose of chilling Dahlia's speech, and they appear "reasonably likely to deter" employees from speaking about misconduct observed within the BPD. Indeed, if it is true that Dahlia did not disclose what he knew when interviewed by IA, the chilling effect was *in fact* achieved, albeit for a limited time. The same might be said of Rodriguez's alleged stunt in the park—calling Dahlia to the scene of a purported crime only to confront him with another officer and threaten him to stay silent. With further factual development, the same might also be true of the ongoing harassment and threats that Dahlia suffered from Rodriguez, Penaranda and other officers.

We note that in the Title VII context—from which the *Coszalter* standard is derived—courts have found that far less serious actions were sufficient to deter a reasonable employee from engaging in protected speech. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70–71 (2006) (concluding that a change in work assignment within the same job description would have deterred a reasonable employee from making a charge of discrimination); *Brooks v. City of San Mateo*, 229 F.3d 917, 928–29 (9th Cir. 2000) (noting that "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion" constitute adverse employment actions, whereas "declining to hold a job open for an employee and badmouthing an employee outside the job reference context" do not). Threats to put someone in jail or that cause an employee to fear for his own safety easily exceed the "reasonably likely to deter" standard. Construing the allegations in the light most favorable to Dahlia, we conclude that he has sufficiently stated that he suffered adverse employment actions.[24]

---

[24] This step of the *Eng* test has a sub-element that is not at issue in this appeal: whether the plaintiff's speech was a substantial or motivating factor in the adverse employment action. That issue was not raised in the briefs, and we do not reach it. *See Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008). We note only that although much of the alleged harassment preceded Dahlia's ultimate disclosure to LASD, such chronology does not necessarily weigh against a finding that the harassment was an adverse employment action meant to discourage Dahlia from reporting the misconduct to others. In other words, insofar as the harassment was intended to chill Dahlia's protected speech, it may qualify as an adverse employment action. *See, e.g.*, *Allen v. Scribner*, 812 F.2d 426, 434 n.17 (9th Cir.) (noting in a First Amendment § 1983 retaliation case that a valid claim can be stated "[w]here comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse . . . action will follow the failure to accede to the official's request

## IV.  CONCLUSION

We overrule *Huppert v. City of Pittsburg* and hold that Dahlia has sufficiently stated a claim pursuant to 42 U.S.C. § 1983, namely that he was retaliated against for his protected speech.    We remand to the district court for further proceedings consistent with this opinion.

## REVERSED AND REMANDED.

PREGERSON, Circuit Judge, specially concurring:

Burbank Police Department Detective Angelo Dahlia witnessed his fellow police officers physically abuse suspects in custody during a high profile robbery investigation.[1] Among other acts of misconduct, Detective Dahlia saw Lieutenant Rodriguez grab a suspect by the throat and threaten him by placing a gun under his eye.  Detective Dahlia also witnessed Sergeant Penaranda repeatedly punch a suspect.

When Detective Dahlia reported these acts of misconduct to Lieutenant Murphy, his superior officer, Murphy told Dahlia to "stop his sniveling."  When Dahlia persisted with

---

[that the employee curtail his first amendment rights]" (second alteration omitted in original) (internal quotation marks omitted)), *amended*, 828 F.2d 1445 (9th Cir. 1987).

[1] Because Dahlia's case was dismissed on a motion to dismiss, we treat Dahlia's allegations in his complaint as true in reviewing his claim.  *See Two Rivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

his complaints, Murphy told him he "didn't want to hear this shit again." Before and then after Dahlia was interviewed by Internal Affairs, Lieutenant Rodriguez and Sergeant Penaranda, his superior officers, threatened and intimidated him.

After the FBI became involved, Lieutenant Murphy told Detective Dahlia that "[t]he Feds are doing an investigation and heads are going to roll. Don't say anything." Sergeant Penaranda likewise instructed Dahlia, "It's gonna be bad. You can't say anything." Lieutenant Rodriguez admonished Detective Dahlia "not to talk to the feds." He also warned Dahlia, "Fuck with me and I will put a case on you, and put you in jail."

Detective Dahlia reported Lieutenant Rodriguez's threats to the Burbank Police Officers' Association. Dahlia disclosed all of the officers' unlawful misconduct to the Los Angeles County Sheriff's Department. Shortly thereafter, Dahlia was placed on administrative leave.

Dahlia filed a complaint under 42 U.S.C. § 1983 for First Amendment retaliation. I hold to the view that all of Dahlia's speech that reported unlawful acts by his fellow officers is protected under the First Amendment from retaliation by his superior officers at the Burbank Police Department.

## I. *Garcetti*'s Limitation on Speech Made Pursuant to Official Duties Does Not Apply to Dahlia's Reports of Police Abuse.

I agree with the majority opinion that Detective Dahlia's speech that reported police abuse is without a doubt a matter of public concern. Maj. Op. at 14. I respectfully disagree

with the majority on how *Garcetti v. Ceballos*, 547 U.S. 410 (2006) applies to this case.  The majority opinion tells us that under *Garcetti*,  "[e]ven construing the facts and drawing all inferences in Dahlia's favor, the only reasonable conclusion is that Dahlia acted pursuant to his job duties when he—as a detective investigating the Porto's robbery and prior to receiving any threats or orders to the contrary—reported up the chain of command to the supervising lieutenant overseeing the investigation about abuse related to that same investigation."  Maj. Op. at 33.  Thus, Dahlia's speech that reported up the chain of command is not protected by the First Amendment against public employer retaliation.  But according to the majority opinion, Dahlia's speech that reported police abuse outside the chain of command to Internal Affairs, the Burbank Police Officers' Association, and the Los Angeles Sheriff's Department, was not within his official duties and is protected under the First Amendment against public employer retaliation.  Maj. Op. at 34–36.  In my view, the majority opinion misapplies *Garcetti* to Dahlia's speech reported up the chain of command.

In *Garcetti*, the public employee, Richard Ceballos, was a deputy district attorney who was expected "to advise his supervisor about how best to proceed with a pending case." *Garcetti*, 547 U.S. at 421.  To fulfill that duty, Ceballos wrote a memo that recommended that a pending criminal case be dismissed.  *Id.* at 414, 421.  In the memo, Ceballos stated his opinion that an affidavit used to obtain a warrant contained misrepresentations.  *Id.* at 414.  Ceballos's supervisors reviewed his memo, discussed it, disagreed with its recommendation, and went forward to prosecute the case.  *Id.* at 414–15, 423.  The Supreme Court held that "the memo was written pursuant to Ceballos's official duties."  *Id.* at 421–24.

Thus, Ceballos could not base a First Amendment retaliation claim on the memo.  *Id.*

*Garcetti*'s restriction on First Amendment protection for public employee's speech pursuant to their official duties does not apply to Dahlia for three reasons:  (1) Dahlia's superior officers restricted Dahlia's speech so that they could cover up unlawful conduct; (2) Dahlia's superiors forbade Dahlia from reporting the police abuse; and (3) Dahlia's superiors sought only to silence Dahlia's speech.

First, *Garcetti* did not give public employers an unlimited right to restrict the speech of their public employees. "Employees in some cases may receive First Amendment protection for expressions made at work." *Garcetti*, 547 U.S. at 420. *Garcetti* held that when public employees speak on matters of public concern, they "must face only those speech restrictions that are necessary for their [public] employers to operate efficiently and effectively." *Id.* at 419.  To that end, *Garcetti* explained that speech made pursuant to official duties is speech that public employees express when carrying out routine functions.  *Id.* at 421–23.  The purpose of *Garcetti*'s restriction is to ensure that courts do not supervise a government employer's day-to-day operations.  *Id.* at 420–23.

In contrast, Dahlia's superior officers restricted Dahlia's speech to cover up blatantly unlawful conduct.  Such conduct has no connection to the government's legitimate efforts to run efficient and effective routine operations at issue in *Garcetti*.  Thus, Dahlia's superiors' unlawful efforts are not the type of government operations that *Garcetti* seeks to insulate from judicial review. *Id.* at 421–22; *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 300

(2007) (citing *Garcetti* and holding that an athletic association, like a public employer, can "impose only those conditions on . . . speech [concerning matters of public concern] that are necessary to managing an efficient and effective state-sponsored high school athletic league").

Second, *Garcetti* instructs us that as a "practical" matter, an official duty is a task that the "employee actually is expected to perform." *Garcetti*, 547 U.S. at 424–25. It makes no sense to permit the Burbank Police Department to: (1) forbid Dahlia from reporting police abuse; and then (2) claim that the forbidden reporting was part of his official duties, and thus, not subject to First Amendment protection against retaliation.

Third, *Garcetti* emphasized that public employers must be able to evaluate official communications to ensure that they reflect "substantive consistency and clarity," and are "accurate, demonstrate sound judgment, and promote the [public] employer's mission." *Id*. at 422–23. None of this happened here. Dahlia's superior officers made no effort to evaluate Dahlia's speech for consistency, clarity, or conformity with a legitimate employer mission. Nor did Dahlia's superiors raise any concern with the veracity or accuracy of Dahlia's speech. Instead, Dahlia's superiors sought only to *silence his speech*.

For these reasons, *Garcetti*'s bar on First Amendment protection for speech made pursuant to official duties does not apply to Dahlia's reports of police abuse.[2]   Therefore

---

[2] Contrary to the majority opinion's suggestion, my analysis does not hinge on whether Detective Dahlia defied his superior officers' orders, it is based solely on the unlawful conduct of his superior officers. Maj. Op.

Dahlia's reports, a matter of public concern, are protected by the First Amendment from public employer retaliation. *Garcetti*, 547 U.S. at 420, 424; *Connick v. Myers*, 461 U.S. 138, 149 (1983) (finding that an assistant district attorney's inquiry to coworkers made at work, that "touch[ed] upon a matter of public concern," constituted protected speech).

## II. The Majority's Chain of Command Guidelines Lead to a Vexing Result in the Context of Police Abuse.

The practical reality is that quite a few police officers are reluctant to report acts of police abuse committed by their fellow officers. The "'officer code of silence'" describes the understanding that "'an officer does not provide adverse information against a fellow officer.'" *Cunningham v. Gates*, 229 F.3d 1271, 1283 n.19 (9th Cir. 2000) (quoting Report of the Independent Commission on the Los Angeles Police Department at 168 (1991)). The public's trust is diminished when a law enforcement officer abides by the code of silence to cover up misconduct engaged in by fellow officers.[3] To

---

at 33 n.19. Accordingly, *Garcetti*'s restriction should not apply to Detective Dahlia's reports of police abuse made to Lieutenant Murphy. From the outset, (1) Lieutenant Murphy restricted Dahlia's speech so that he could cover up unlawful conduct; (2) Lieutenant Murphy forbade Dahlia from reporting the police abuse; and (3) Lieutenant Murphy sought only to silence Dahlia's speech.

[3] *See, e.g.*, *Brandon v. Holt*, 469 U.S. 464, 467 (1985) (noting district court's finding that "[d]ue to a code of silence induced by peer pressure . . . , few—if any—formal complaints were ever filed by police personnel" (internal quotations marks omitted)); *Blair v. City of Pomona*, 223 F.3d 1074, 1080 (9th Cir. Cal. 2000) (holding "evidence, if believed by the jury, would be sufficient to establish that the [Police] Department had the custom of chastising whistleblowers" and that officials in the Police Department "were aware of the police code of silence"); Matt Pearce, *Jury*

strengthen the public's confidence in the integrity of its law enforcement officers, it is essential that an officer be encouraged or required to report misconduct committed by fellow officers.

The majority's chain of command guidelines undermine policies that require law enforcement officers to report police abuse up the chain of command. Under the majority opinion's approach, a police officer who complies with his duty and reports unlawful acts to his superiors, and as a consequence is fired for his speech, has no First Amendment protection. In contrast, a police officer who reports unlawful acts to the news media, and as a consequence is fired for his speech, is shielded by the First Amendment.[4] Police officers are trapped in a Catch 22: violate their duty to report up the chain of command or expose themselves to retaliation. A police officer who witnesses police abuse may turn a blind eye to avoid either consequence. This outcome "chills the

_Rules Chicago Police 'Code of Silence' Protected Felon Cop_, LOS ANGELES TIMES, Nov. 14, 2012 ("A pervasive culture of silence in the Chicago Police Department led officers to try to cover up the brutal 2007 bar beating of a 115-pound bartender by a 225-pound off-duty officer, a federal jury has decided."); John Hagedorn et al., _Crime, Corruption and Cover-ups in the Chicago Police Department_, 2013 UNIV. OF ILL. AT CHI. DEP'T OF POLITICAL SCIENCE, ANTI-CORRUPTION REPORT NO. 7, at 1 ("The 'blue code of silence,' while difficult to prove, is an integral part of the department's culture and it exacerbates the corruption problems.").

[4] As we have recognized, "[i]n the context of 'good faith whistleblowing' involving reports within a government department rather than to the public, 'the breadth of one's audience is irrelevant' because '[i]t would be absurd to extend First Amendment protection only to those whistleblowers who immediately appear on the local news.'" _Robinson v. York_, 566 F.3d 817, 824 (9th Cir. 2009) (quoting _Hufford v. McEnaney_, 249 F.3d 1142, 1150 (9th Cir. 2001)).

speech of potential whistleblowers in a culture that is already protective of its own." *Dahlia v. Rodriguez*, 689 F.3d 1094, 1104 (9th Cir. 2012). *Garcetti* does not require this untenable result.

## III.    Conclusion.

I agree with the majority opinion that Detective Dahlia stated a claim under 42 U.S.C. § 1983 for First Amendment retaliation.[5]   But for the foregoing reasons, I believe that Dahlia's claim may be based on all of his speech that reported police abuse, whether reported up the chain of command or outside the chain of command.

O'SCANNLAIN, Circuit Judge, with whom KOZINSKI, Chief Judge, joins, concurring only in the judgment:

Seven years ago, the Supreme Court counseled us that we had "misconceive[d] the theoretical underpinnings" of First Amendment retaliation law. *Garcetti v. Ceballos*, 547 U.S. 410, 423 (2006). I respectfully dissent from the majority's analysis because our court makes the same error today by rejecting what California law tells us about the professional duties of that state's police officers. Furthermore, I fear that today's new approach will lead to "judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of

---

[5] I agree with the majority's analysis and conclusion that Dahlia sufficiently stated an adverse employment action. The remaining requirements of *Eng v. Cooley* are not at issue in this appeal. *See* 552 F.3d 1062, 1070 (9th Cir. 2009).

powers." *Id.* Federal courts have no business managing the daily activities of police departments.

I

We reheard this case en banc to consider whether *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009), should remain good law. That case called on us to apply *Garcetti*'s holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes" to a lawsuit brought by a California police officer. 547 U.S. at 421. We determined that the duty of California law enforcement officers to report criminal activity meant that the officer's reports of police misconduct internally, as well as to the FBI, did not qualify as protected "citizen-speech." Although I might not preserve every line of that opinion, at its core, *Huppert* got *Garcetti* right. Two key insights emerge from that case that help illustrate how the majority in this case has gone off track.

First, *Huppert* correctly appreciated that the *Garcetti*-inquiry is no trifle. *Id.* at 702–03. Like *Connick v. Myers*, 461 U.S. 138 (1983), which asks whether a public employee's speech is on a matter of public concern, *Garcetti* delineates the First Amendment's very scope. Put differently, the speech at issue "must not be expression on-the-job and within the scope of the employee's duties; if it is, there is no First Amendment protection for the speech." Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 1151 (4th ed. 2011). Instead, a would-be plaintiff's remedy usually lies in

"the powerful network of legislative enactments" that protect whistleblowers. *Garcetti*, 574 F.3d at 425.[1]

Second, *Huppert* understood that with the "pursuant-to-official-duties" test, the *Garcetti* Court was charting a clear course that distinguished between citizen-speech and employee-speech. *See* 574 F.3d at 702.[2] There, the Supreme Court explained that

> [the plaintiff] did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen

---

[1] The lack of a constitutional action may sometimes be for the best, as this "complicated employment law issue . . . is much better suited for a legislative solution." John Q. Mulligan, Note, Huppert, Reily*, and the Increasing Futility of Relying on the First Amendment to Protect Employee Speech*, 19 Wm. & Mary. Bill Rts. J. 449, 456 (2010). Many questions arise, such as "what types of complaints should be protected, whether internal or external whistleblowing should be protected, and what types of employer responses should be punished." *Id.* at 468.

[2] The dissenters in *Garcetti*, as well the academic literature since, recognize the bright-line nature of the inquiry. *See, e.g.*, *Garcetti*, 547 U.S. at 432 (Souter, J., dissenting) (majority "categorically separat[es] the citizen's interest from the employee's interest"); *id.* at 427 (Stevens, J., dissenting) (similar); *id.* at 446 (Breyer, J., dissenting) (majority approach described as "absolute"); Chemerinsky, *supra*, at 1147 (describing *Garcetti* as "a categorical exception from constitutional protection for speech which is on the job in the scope of the employee's duties"); Caroline A. Flynn, Note, 111 Mich. L. Rev. 759, 761 (2013) (*Garcetti* "replaced the balancing framework with a bright-line rule"); Monique Alexandra Bair, *Garcetti v. Ceballos*: *Swapping The First Amendment Rights of Public Employees for Greater Government Control*, 37 Rutgers L. Rec. 44, 52–55 (2010) (same).

> by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee.

*Garcetti*, 547 U.S. at 422. The consequence of the citizen/employee dichotomy is that protection in the workplace is to be the exception—not at all the rule. *See, e.g.*, *id.* at 420 ("Employees *in some cases* may receive First Amendment protection for expressions made at work") (emphasis added); *Morales v. Jones*, 494 F.3d 590, 598 (7th Cir. 2007) (noting that "the purpose of *Garcetti* was to allow government employers greater influence over speech that owes it[s] existence to a public employee's professional responsibilities").

With its decision to discard *Huppert*, and with its newly-minted "guiding principles" for identifying protected speech, the majority opinion reopens doors that *Garcetti* slammed shut. *See* Maj. Op. at 21, 28–32.

## II

## A

I cannot agree that "the *Huppert* majority failed to heed *Garcetti*'s mandate" about a practical inquiry by taking stock of California courts' "description of a California police officer's professional duties." Maj. Op. at 21. Here is the entirety of what the Supreme Court said on this issue:

> Two final points warrant mentioning. First, as indicated above, the parties in this case do not

> dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. See *post*, at 1965, n.2 (SOUTER, J., dissenting). The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.[3]

*Garcetti*, 547 U.S. at 424. This passage appears near the end of the opinion, after the Court announced its conclusion of law and after it applied that holding to the plaintiff's facts. *Id.* at 420–22. It is written as a rejoinder to the principal dissent's worry that "one response to the Court's holding will be moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview." *Garcetti*, 547 U.S. at 431 n.2 (Souter, J., dissenting).

---

[3] The second point the Court made is that the *Garcetti* analysis should not uncritically be applied when academic freedom is involved. *See* 547 U.S. at 425.

Read in context, this practical-inquiry passage simply directs us not to engage in a stilted or excessively formulaic inquiry. On the one hand, the Court is explaining that the sort of gamesmanship Justice Souter feared is not to be tolerated. On the other hand, the *Garcetti* Court is explaining (as cogently expressed by the Sixth Circuit) that "[s]peech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it owes its existence to the speaker's professional responsibilities." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (alteration and internal quotation marks omitted). The prototypical examples of protected speech are "writing a letter to a local newspaper, as the teacher-plaintiff did in *Pickering*" and "discussing politics with a co-worker." *Foley v. Randolph*, 598 F.3d 1, 6 (1st Cir. 2010) (discussing *Garcetti*, 547 U.S. at 423). In *Garcetti*, the plaintiff did not engage in these types of actions; instead he "spoke as a prosecutor." 547 U.S. at 421. That speech was unprotected because "[w]hen a public employee speaks pursuant to employment responsibilities" there generally is not a "relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

In the case before us, we confront what it means to speak as a police officer. I would not interpret the Supreme Court's caution against formalism—the "practical-inquiry" passage from *Garcetti*—as an obstacle to our evaluating a public-employee plaintiff's case against the backdrop of legal and professional norms. *See, e.g.*, *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) (taking notice, in reviewing a motion to dismiss, of the oversight responsibilities of a state legislative committee and of the duties of the administrator of the gaming board); *Foley*, 598 F.3d at 4 (considering

Massachusetts General Laws ch. 48 § 42, which spells out a fire department chief's "powers and duties," as well as the specific contract that governed the chief's employment).

B

1

California courts tell us that, "[u]nlike civilians," that state's police officers are "expected to prevent others from committing crimes, to assist in the investigation of crime, and to use their law enforcement authority to maintain the trust of the public in its criminal justice system." *People v. Owens*, 69 Cal. Rptr. 2d 428, 430–31 (Ct. App. 1997) (upholding a District Attorney's decision to single out an off-duty police officer for prosecution for engaging in a pyramid scheme because, in contrast to his civilian confederates, he had "failed to discharge" the "special obligations" of his office).

This principle was first articulated in the canonical case of *Christal v. Police Commission of City and County of San Francisco*, 92 P.2d 416 (Cal. Ct. App. 1939). *See also Titus v. Los Angeles Cnty. Civil Serv. Comm'n*, 181 Cal. Rptr. 699, 703 (Ct. App. 1982) (stating that *Christal* "enunciated the role of a law enforcement officer."). "Among the duties of [California] police officers" is the responsibility to disclose "all information known to them which may lead to the apprehension and punishment of those who have transgressed" their state's laws. *Christal*, 92 P.2d.at 419. The case further explained that "[w]hen police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury." *Id.*

*Christal* went so far as to say that "[i]t is for the performance of these duties that police officers are commissioned and *paid by the community*." *Id.* (emphasis added); *compare with Garcetti*, 547 U.S. at 422 (explaining that when the plaintiff "performed the tasks he was *paid to perform*" he had "acted as a government employee" (emphasis added)). Dahlia has not marshaled any authority undermining *Huppert*'s conclusion that police officers still have these obligations when speaking to external law enforcement agencies, such as the county sheriff or FBI. *See* 574 F.3d at 707.[4]

My colleagues deride these duties as either relics of a bygone era or judicial musing too naive to credit. *See* Maj. Op. at 20 n.9 (the "passage from *Christal* relied upon by the

---

[4] California law, in fact, suggests just the opposite. In one case, an Alhambra Police Department Officer who had sexually harassed a motorist went to his union representative for help in dealing with the Los Angeles Sheriff's Department investigation into his misconduct. *Alhambra Police Officers Ass'n v. City of Alhambra Police Dep't*, 7 Cal. Rptr. 3d 432, 434–35 (Ct. App. 2003). In that meeting, the officer disclosed incriminating details; the union representative failed to pass along evidence to his superiors and helped the officer retrieve a document with the driver's telephone number on it—a violation of several department policies. *Id.* The California Court of Appeal found that the union representative had an obligation to assist in bringing the officer's misconduct to light, based on *Christal* and its progeny. Obviously this broad duty is part of the special responsibility of police and not something characteristic to most other forms of public employment. *See, e.g.*, *Davis v. McKinney*, 518 F.3d 304, 316 (5th Cir. 2008) (explaining it was not within a public university's "auditor's job function to communicate with outside police authorities [such as the FBI] or other agencies [such as the Equal Employment Opportunity Commission] in an investigation"); *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) (deciding that it was not part of a correctional officer's "official tasks to complain to [a] Senator or the [Inspector General] about the state's failure to perform its duties properly").

*Huppert* majority reads like a civics textbook"). Yet the California Government Code in force today states that public safety officers may be ordered "to cooperate with other agencies involved in criminal investigations [and] [i]f an officer fails to comply with such an order, the agency may officially charge him or her with insubordination." Cal. Gov't Code § 3304. And, numerous California cases have cited the *Christal* principle over the decades to express "the all-important concept of the peculiar and delicate position police officers hold in society." *Frazee v. Civil Serv. Bd. of Oakland*, 170 Cal. App. 2d 333, 335 (Ct. App. 1959). As the City of Burbank has argued to us, in a wide variety of settings the unique charge of those tasked with enforcing the criminal laws has overridden other important rights. *See, e.g.*, *Titus*, 181 Cal. Rptr. at 363–65 (demanding that officers forsake attorney-client privilege in order "to cooperate in a criminal investigation"); *Riverside Cnty. Sheriff's Dept. v. Zigman*, 87 Cal. Rptr. 3d 358, 361–62 (Ct. App. 2008) (describing "a law enforcement officer's duty to report criminal activity to his or her employer," and explaining that the "statutory privilege at issue in this case, must yield when [its] exercise is inconsistent with the performance of the officer's duties").

The majority also rejects this "court-created job description applicable to every member of [the] profession" by invoking the specter of employer gamesmanship. Maj. Op. at 21. Given its seventy-plus year lineage, the California police officer description of duty could not possibly be a reaction to the *Garcetti* opinion. *Cf. Garcetti*, 547 U.S. at 431 n.2 (Souter, J., dissenting) ("I am pessimistic enough to expect that one response to the Court's holding will be moves by government employers to expand stated job descriptions. . . ."). More importantly, however, there are legitimate reasons for California to have imposed admittedly

exacting obligations on its police. Just as Caesar's wife must be above reproach, "peace officers have been held to a higher standard than other public employees," because that is essential to "maintain the public's confidence in its police force." *Pasadena Police Officers Ass'n v. City of Pasadena*, 797 P.2d 608, 611 (Cal. 1990) ("[T]he public expects peace officers to be above suspicion of violation of the very laws they are sworn to enforce" (internal quotation marks and alterations omitted)).

2

Recently, the Supreme Court recalled that categorical rules have the virtue of keeping "easy cases easy." *Florida v. Jardines*, 133 S. Ct. 1409, 1417 (2013). In that spirit, I read *Garcetti* as fully compatible with a stated obligation of California police officers to report crime—a subset of which is to help expose and to assist in the investigation of crime within their ranks.[5] A California-police-officer plaintiff must engage with "California's jurisprudence defining such duties." *Huppert*, 574 F.3d at 707. After all, "the plaintiff bears the burden of showing [his] speech was spoken in the capacity of a private citizen and not a public employee." *Eng*, 552 F.3d at 1071.

When as here, a court is called on to evaluate whether a complaint states a First Amendment retaliation claim, it should evaluate its plausibility against this legal landscape. *Cf. Morales*, 494 F.3d at 598 ("[T]he Milwaukee Police Department requires officers to report all potential crimes.

---

[5] *See Dahlia v. Rodriquez*, 689 F.3d 1094, 1105 (9th Cir. 2012) (characterizing *Huppert*'s rule as one under which "whistleblowing on fellow officers is part of a police officer's official duties").

By informing A.D.A. Chisholm of the allegations against Chief Jones and Deputy Chief Ray, Morales was performing that duty as well. Accordingly, his conversation with A.D.A. Chisholm is not protected under the First Amendment after *Garcetti*."). In a similar vein, as mentioned above, the Seventh Circuit considered whether a complaint stated a claim for First Amendment retaliation in the context of *state-law* duties:

> Ms. Tamayo's testimony was given to the House Gaming Committee, a legislative committee responsible for overseeing the activities of the [Illinois Gaming Board], and her testimony involved the alleged wrongdoing of public officials in their attempts to encroach on the agency's independence. As the Administrator of the agency, she had a duty to see that the law was administered properly. This responsibility encompassed a duty to bring alleged wrongdoing within her agency to the attention of the relevant public authorities—here, the House Gaming Committee.

*Tamayo*, 526 F.3d at 1091. That administrator sought to "escape the strictures of *Garcetti* by including in her complaint the conclusory legal statement that she acted 'as a citizen . . . outside the duties of her employment.'" *Id.* at 1092. Appropriately invoking *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the court did not credit these legal conclusions "couched as a factual allegation." *Id.*

Similarly, it would be up to a California police officer to "plead[] factual content that allows the court to draw the

reasonable inference that" his department imposes less stringent crime-reporting duties on its employees than California courts routinely acknowledge. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[6] He would need to put at issue that his is a "case[] where there is room for serious debate." *Garcetti*, 547 U.S. at 424. Such application of *Garcetti* is also in line with the rule that, in measuring the sufficiency of a complaint, "the reviewing court [should] draw on its judicial experience and common sense"; it is eminently logical that officers have precisely the duty that California courts claim they do. *Iqbal*, 556 U.S. at 679.[7]

Assuming an officer's "well-pleaded facts" do suggest that *Christal/Huppert* are a poor fit for his circumstance, *id.* at 679, then the case would proceed to summary judgment. At that stage, evidence showing that his duties are truly limited in the fashion he had alleged would need to be proffered. Discovery generally will have unearthed the relevant materials, and then the court would be free to discern which statements, if any, fell outside the officer's duties. *See, e.g.*, *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204–05 (10th Cir. 2007) (deciding at summary judgment which statements by teachers passed and failed *Garcetti*); *Charles v. Grief*, 522 F.3d 508, 513 n.17 (5th

---

[6] An officer might do that by describing his employment contract, a collective bargaining agreement, or a (formal or informal) policy limiting his disclosure obligations.

[7] Simply put, "[t]here is nothing startling in the conception that a public servant's right to retain his office or employment should depend upon his willingness to forego his constitutional rights and privileges to the extent that the exercise of such rights and privileges may be inconsistent with the performance of the duties of his office or employment." *Christal*, 92 P.2d at 419.

Cir. 2008) (considering the "factual circumstances surrounding the speech at issue" to decide "whether *Garcetti* applies").

The Court's mission in *Garcetti* was to articulate a "screening test a judge should apply" when a government employee tried to invoke the First Amendment. *See Garcetti*, 547 U.S. at 445–46 (Breyer, J., dissenting). Concerned that, in practice, not every police department in California expects its officers to live up to the duties spelled out by its judiciary, the majority decides to screen almost nothing. By contrast, as I have explained, the approach faithful to *Garcetti* would have been to preserve *Huppert* as the default presumption, while also acknowledging the possibility that on occasion a police officer might be able to avoid its application.

## III

With utmost respect to my colleagues in the majority, I find their "guiding principles" about implementing *Garcetti* similarly untenable. Maj. Op. at 28.

First, the majority decides that if "a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." Maj. Op. at 29. By contrast, as California courts have made clear,[8] the police have a unique role in society that makes it inappropriate to rely on case law involving other types of public employment to decide that officers' speech will be protected when delivered "to persons outside the work place," *i.e.*, outside

---

[8] *See supra* note 7 and accompanying text.

their own police department.  *Id.* at 28; *cf.* Kendall Turner, Dahlia v. Rodriguez: *A Chance to Overturn a Dangerous Precedent*, 65 Stan. L. Rev. Online 59, 63 (2012) (astutely perceiving that "[i]f a janitor cleaning Dahlia's station had noted the same illegal interrogation tactics, he could presumably enjoy First Amendment protection while reporting them because his job did not require him to expose illegal activity").[9]

The majority's third "guiding principle"—an employee is no longer carrying out his professional duties when he does so in the face of a threat or directive by his supervisor to break the law or protocol—follows the Second Circuit's misguided approach. *See Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).  Once again, the majority resorts to the "practical-inquiry" passage for substantiation.  Maj. Op. 31.  And once again, we "get[] *Garcetti* backwards."  *Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir. 2011).

There are two key problems with the Second Circuit's approach that our court adopts today.  First, it conflates the "adverse-action" element of a retaliation claim and the "pursuant-to-official-duties" test.  Subtly, the *Jackler* rule allows concern for what happened to a particular plaintiff to color the threshold question about job duties.  *See Bowie*, 653 F.3d at 48 ("[I]t is not difficult to sympathize with the Second Circuit's dubious interpretation of *Garcetti*.  The police chief's instruction to Jackler and the actions he ordered Jackler to take were clearly illegal.  But the illegality of a government employer's order does not necessarily mean the

---

[9] I would not adopt the majority's second principle concerning the "subject matter" of speech for the same reason.  Maj. Op. at 30.  A police officer is not "an average public employee."  *Id.*

employee has a cause of action *under the First Amendment* when he contravenes that order.").

Second, *Jackler*'s holding subverts *Garcetti* by not applying the Court's categorical rule that the protected-status inquiry hinges on job duties, and job duties alone. *Jackler* involved a police officer who witnessed his sergeant lose his temper and unjustifiably strike an arrestee. 658 F.3d at 230–31. After the officer reported what had happened in a supplemental report, the sergeant pressured him to substitute his honest report for one "which contained false, incomplete and misleading information." *Id.* at 231. He refused, and was fired. *Id.* at 232.

In dismissing his claim under *Garcetti*, the district court determined that it was "clear on the facts as alleged by Jackler that he refused to withdraw or alter his truthful report in the belief that the proper execution of his duties as a police officer required no less." *Id.* at 233. The Second Circuit did not disagree that as a "police officer [he certainly] ha[d] a duty not to substitute a falsehood for the truth." *Id.* at 241. But then, instead of applying *"Garcetti*'s employee-versus-citizen rule," the Second Circuit "created a significant exception to it." Caroline A. Flynn, Note, *Policeman, Citizen, or Both? A Civilian Analogue Exception to* Garcetti v. Ceballos, 111 Mich. L. Rev. 759, 775 (2013).

Today's en banc court simply borrows *Jackler* without discussing its rationale; but as the D.C. Circuit has explained, that case is indefensible. The Second Circuit reasoned that Officer "Jackler's refusal to comply with orders to retract his truthful Report and file one that was false has a civilian analogue and that Jackler [thus] was not simply doing his job in refusing to obey those orders from the department's top

administrative officers and the chief of police." *Jackler*, 658 F.3d at 241–42. The problem with this approach is that while *Garcetti* did state that its abstract ambition was to protect the kinds of speech for which there is a relevant civilian analogue, 547 U.S. at 424, the Supreme Court unambiguously settled on a categorical rule as opposed to the potentially more calibrated (but also more subjective) proposals floated in the trio of dissenting opinions. *See Bowie*, 653 F.3d at 48 ("As all of the dissenting justices recognized, *Garcetti* categorically denies recovery . . . to plaintiffs who spoke pursuant to official duties." (internal quotation marks and alteration omitted)). The principal dissent puts this matter as plain as can be, explaining that "when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect" the majority opinion places this "speaker[] beyond the reach of First Amendment protection against retaliation." *Garcetti*, 547 U.S. at 433 (Souter, J., dissenting).[10]

I would therefore adopt neither the majority's "contrary-to-orders" maxim nor its rule about "disclosures outside the chain of command."

---

[10] Although the academic literature—some of which has been cited in the briefs—has urged us to do otherwise, our duty is to apply Supreme Court precedent fairly rather than whittle it away in a case with sympathetic facts. *See, e.g.*, Turner, *supra*, at 64 ("While lower courts are of course not free to ignore *Garcetti*, they are free to—and should—take a narrow view of what constitutes an employee's 'official duties.'"); *id.* at 63 ("Of course, the fundamental problem may be with *Garcetti* itself rather than *Huppert*."); Flynn, *supra*, at 772 (although disposed to the dissenting view as a policy matter, conceding, "in agreement with the D.C. Circuit, that the Second Circuit misapplied *Garcetti* in *Jackler*: a civilian analogue exception does not follow from either the language or the logic of that decision").

IV

Remaining now is the application of the foregoing framework to Dahlia's complaint.

A

1

As for Dahlia's report to Internal Affairs ("IA"), the majority states "[i]t is possible that Dahlia's professional duties required him to meet with IA at IA's insistence, but it is also plausible that Dahlia's act of meeting with IA was outside his job duties for the purpose of the First Amendment." Maj. Op. 34. Under the Supreme Court's *Twombly* and *Iqbal* precedents, it is *plaintiff's* responsibility to show that his speech qualifies for constitutional protection. *See Iqbal*, 556 U.S. at 678 (the Rule 8(a) pleading standard "asks for more than a sheer possibility . . . .[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" (internal quotation marks omitted)). The majority incants the term "plausible" without pointing to allegations which make it so.

Dahlia's complaint alleges that IA initiated an investigation and came to interview him three times. Compl. ¶ 36. Dahlia does not say he sought out IA, nor does he claim that he was free either to stay silent when asked about the corruption he had witnessed, or to lie about it. Given the

inherent *im*plausibility of that scenario,[11] his complaint most certainly lacks "factual allegations that 'raise [his] right to relief above the speculative level.'" *Tamayo*, 526 F.3d at 1092 (quoting *Twombly*, 550 U.S. at 555) (alteration in original)).

2

Dahlia's allegations about his "speech" to the County Sheriff's Department are similarly threadbare. The majority concludes that the protected status of his speech likely turns on "whether discovery reveals that Dahlia's supervisors instructed him to meet with and disclose information to the [sheriff]." Maj. Op. at 36. Such construction of "pursuant to official duties" is woefully cramped. *See, e.g.*, *Foley*, 598 F.3d at 6 ("In analyzing whether Foley spoke as a citizen rather than as the Chief of the Fire Department, we first note that it is not dispositive that Foley was not *required* to speak to the media."); *Brammer-Hoelter*, 492 F.3d at 1203 ("[S]peech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform."); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (per curiam) ("Simply because Williams wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job.").

Without the majority's errant gloss, Dahlia's allegations fall short. His complaint refers to no facts that suggest, let alone *plausibly* suggest, that in cooperating with the sheriff's

---

[11] *See, e.g.*, *Jackler*, 658 F.3d at 241 ("Of course a police officer has a duty not to substitute a falsehood for the truth, *i.e.*, a duty to tell 'nothing but the truth'. . . .").

investigation of corruption in the Burbank Police Department he was not "discharging the responsibilities of [his] office, [but instead] appearing as "[John] Q. Public." *Tamayo*, 526 F.3d at 1092. And as already detailed, the case law and California Government Code Section 3304 indicate that cooperating with an external law enforcement agency "is a duty he 'actually [was] expected to perform.'" *Foley*, 598 F.3d at 7 (quoting *Garcetti*, at 424–25).[12]

Thus, I must conclude that Dahlia's complaint does not state a claim for First Amendment retaliation upon which relief may be granted.

B

In our circuit, though, Dahlia still would have one more chance to pursue his claim. Although the odds are long, Dahlia could conceivably satisfy the pleading standard as to the protected status of his speech by adding particular allegations about the nature of his crime-reporting duty at the Burbank Police Department. In my view, he would be entitled to be granted leave to amend his complaint, and it is on that narrow basis that I would reverse the judgment dismissing his complaint. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (explaining that the court must

---

[12] Because our court is admonished not to manufacture arguments for parties, unlike the majority, I would not consider Dahlia's report to the Burbank Police Officers' Association as an alternative form of protected speech. *See United States v. Williamson*, 439 F.3d 1125, 1138 (9th Cir. 2006); Maj. Op. at 35. Dahlia has not claimed anything beyond his statements to Internal Affairs, to the sheriff's department, and his unsubstantiated report to the FBI as constitutionally protected speech. Nor, has he even alleged that "the retaliation he faced was directly caused by this act of reporting." Maj. Op. at 35.

"grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts"). I also agree with the majority to the extent that Dahlia's request for leave to amend to satisfy the adverse action requirement must be honored.  Maj. Op. at 36–37 nn. 22–23.

V

The malfeasance by officers of the Burbank Police Department which Dahlia witnessed and the threats and intimidation he endured—if true—are shocking and intolerable.  Yet we must stay our collective hand, ever mindful that the "Constitution does not provide a cure for every social ill, nor does it vest judges with a mandate to try to remedy every social problem." *Plyler v. Doe*, 457 U.S. 202, 253 (1982) (Burger, J., dissenting) (citing *Lindsey v. Normet*, 405 U.S. 56, 74 (1972)).  Alongside his First Amendment cause, Dahlia brought claims under provisions of California law that (1) protect public employees from retaliation for disclosing an abuse of authority or a danger to the public safety, California Government Code § 53298, and (2) that shield employees who complain to a government agency, California Labor Code § 6310.  These are the kinds of remedies that the Supreme Court has explained whistleblowers should pursue in the absence of a constitutional claim. *See Garcetti*, 547 U.S. at 425.  However righteous our aims, when we stretch the Constitution to match our sense of justice, we exceed "[t]he judicial power" vested to us in Article III and, by rendering state law nugatory, disserve our federal union.

While I narrowly concur in the judgment, I must respectfully dissent from the court's erroneous analysis of the First Amendment in this case.